23 C.C.P.A.(Patents)

### WHITE v. TRUBE.

Patent Appeal No. 3571.

Court of Customs and Patent Appeals.
June 17, 1936.

H. G. Grover, of New York City (Phil L. Rodier and James G. Norton, both of New York City, of counsel), for appellant.

Pennie, Davis, Marvin & Edmonds, of New York City (R. Morton Adams, Baldwin Guild, and W. H. Taylor, Jr., all of New York City, and C. M. Fisher, of Washington, D. C., of counsel), for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal in an interference proceeding from a decision of the Board of Appeals of the United States Patent Office affirming the decision of the Examiner of Interferences awarding priority of invention to appellee.

The invention in issue relates to an electrical system for coupling together vacuum tubes in radio receivers. It is a compound system, in that two different kinds of couplings are working together —an electromagnetic and an electrostatic.

Of the five counts in issue—1, 2, 6, 7, and 10—counts 1 and 2 are illustrative. They read:

"1. An electrical system composed of an amplifier of alternating currents, a tunable input circuit, an output circuit, an internal path in said amplifier connecting said output circuit to said input circuit, a tunable absorbing circuit associated with said output circuit, and means for limiting amplified energy feed-back through said internal path comprising means for loosely coupling said absorbing circuit to said output circuit and electrical elements maintaining said coupling constant while said absorbing circuit is tuned in consonance with said input circuit.

"2. An electrical amplifying system including a three electrode vacuum tube, an adjustable period circuit connected to the input electrodes of said tube, an output circuit, a responsive device, and means for controlling the reaction of said output circuit and abstraction of energy therefrom for said responsive device over a wide range of frequencies that a predetermined effect in said responsive device with frequency is obtained, including a circuit coupled to said output circuit adapted to be adjusted in period in consonance with said adjustable period input circuit, and across which second adjustable circuit said responsive device is connected, said coupling including a pair of coupling elements transferring energy in

phase, one of which couplings increases in effect with frequency increase and the other of which couplings decreases in effect with frequency increase, the relative values of said couplings being chosen to give the said predetermined effect over a wide range of frequencies."

The interference is between appellant's patent No. 1,780,611, issued November 4, 1930, on an application filed August 11, 1925, and appellee's application No. 509,-309, filed January 17, 1931, approximately two months and two weeks after the issuance of appellant's patent.

Appellee's application, however, is held to be, and is, in fact, a continuance in part of two prior applications, to wit, serial No. 101,906, filed April 14, 1926, and serial No. 120,045, filed July 2, 1926.

The differences in the counts involved, a detailed description and explanation of each of the counts, and an analysis of the evidence have been fully set forth in the decision of the Examiner of Interferences.

The Board of Appeals, in affirming the decision of the Examiner, has, in a more general way, discussed every phase of the case, and explained and analyzed the issues, and, rather than enter upon a detailed discussion of the issues presented, we deem it advisable to quote in extenso from its decision:

"Claims corresponding to the counts first appeared in White's patent and were copied into the application No. 509,309 filed under the name of Trube (deceased) by his administratrix. The counts should therefore be construed in the light of the disclosure in the White patent.

"The present interference is related to Interferences No. 56,064 and No. 56,065. The testimonial record of Trube of the prior interferences was introduced by motion into this record and has been referred to as part 1 of Trube's record here.

"The subject matter relates to coupling means between vacuum tubes particularly of radio receiving sets. According to White's specification it relates to the transfer of alternating currents between two amplifying tubes of the radio frequency section of the set."

After quoting at some length from the patent to White, the Board continued:

"Count 1 includes the means of limiting the feedback through the internal-plate to grid—which means comprise the loose-coupling with that of maintaining the coupling of the tubes constant while the absorbing circuit is tuned.

"Count 2 includes the limitation of transferring energy to give a predetermined effect over a wide range of frequencies. * * *

"Count 6 refers to controlling the reaction of the output circuit in a desired way for frequency change.

"Count 7 relates to transfer of energy only in a desired way by the reciprocally acting elements for different frequencies. * * *

"[Count] 10 * * * [refers] to means for controlling the electrical conduct of the reciprocal types of transfer means for alternating current. * * *

"[Count] 1 * * * [includes] reference to the reactive effect of the output on the input current of a tube, referred to * * * as feed-back. * * *

"Counts 2, 6, 7 and 10 do not refer to the reactive effect but only to the means or method for maintaining the transfer of energy · substantially constant.

"Since Trube is the junior party the burden of proof is upon him to overcome White's filing date. Some controversy has arisen as to the degree or extent of this burden of proof. It is contended by White that since Trube's application here involved was not filed till after White's issue or patent date that the burden is that of proof beyond a reasonable doubt but it is contended by Trube's assignee that the present case has the benefit of applications, Serial No. 101,906 and 120,045, which were copending with White's patent application and that the burden would be only that of preponderance of evidence.

"We have examined the earlier Trube applications and find therein a clear disclosure of the compound coupling of tubes by inductive and capacity coupling in order to produce a desired rate of transfer of energy or voltage effect over a certain range of frequencies. We find the specifications of Trube's earlier cases to be sufficiently relevant to the terms of the counts to warrant the holding that Trube's later case has the benefit of the record to the extent that the Trube proofs need only be of the order of a preponderance of evidence.

"In view of the relation of the parties and records submitted, we find that

the principal question presented here is whether Trube has proven a structure capable of functioning in accordance with the counts and further whether it has been proven as having so operated and to have been disclosed to others prior to White's filing date on which the latter relies. In connection with this phase of the case it appears that Trube's Exhibits 32 and 44, which are two radio sets, together with the testimony and supplemental exhibits relevant thereto, are important items.

"In prior interferences, No. 56,064 and 56,065 we found that the two radio sets, Trube's Exhibits 32 and 44, had been produced by March, 1925, and May, 1925, respectively. A very extended testimonial record has been submitted in support of Trube's activities in regard to these exhibits and relevant matters. Much additional testimony including that of an additional witness has been presented in this respect.

"We have again examined the record in regard to Exhibits 32 and 44 particularly and reaffirm our holding in respect to the dates of production of sets designated Trube's Exhibits 32 and 44.

"It is considered to be necessary here to determine whether Trube's record establishes that he had conception of producing the predetermined action—substantially constant transfer of energy and between stages of radio frequency tubes, as to certain counts and combined with regenerative effect in others—before White's record date.

"Llewellyn testified concerning certain oral disclosures by Trube and discussions particularly in connection with a sketch—page 52, Exhibit 1—which he had with Trube. This disclosure occurred between December 5, 1923 and April, 1925. Llewellyn asserts that Trube stated that the object of the circuit was to secure a coupling circuit in radio amplifiers which would be such as not to produce oscillations and one that would not oscillate at any of the broadcast frequencies and to provide a means of amplifying such radio frequency signals without oscillation. There was no explanation of whether the magnetic coupling was tight or loose, Llewellyn's XQ. 62.

"Mr. Mompere testifies that Trube explained to him that he intended to produce a circuit or set which would be free from oscillations over the entire range as well as give amplification over such entire range. Mr. Mompere was Chief Engineer of the Thermiodyne plant at Plattsburg at that time and was considering the production of a new model of radio set to be used during 1925. The new model was subsequently named the New TF6. It is established by the record that Trube's exhibit No. 32 is a model which embodied the new circuit which had been submitted by Trube at that time. Exhibit No. 32 is identified by Mompere and shown to be one of a group of fifty sets made in February, 1925, XQ. 62. Mompere does not distinguish between the action of the set as a whole and of one of the stages of radio frequency, XQ. 143, nor the particular new functions of the essential elements of the new circuit very definitely, XQs. 146 and 147. He states that the set as a whole had higher amplifying power, RD 29, but does not know when the New TF6 set was provided with 1¾ turns of wire on the smaller coil of the transformer. It appears that the set was probably altered in this respect.

"Vroom identifies several of Trube's sketches and notes, and states that Trube explained to him that the object of the circuit was to obtain an arrangement of vacuum tubes whereby two tubes could be coupled together so that any adjustments in the circuit of the tube receiving power would not produce oscillations in the circuit of the tube supplying power, XQs. 15 and 42.

"McDonough identifies Exhibit 44 and states that it was a TF6 set that had been in his possession since May 1925. Exhibit 44 embodies elements which are arranged according to the plan of the parallel connection of condenser and transformer such as is capable of satisfying the broader counts if properly proportioned. McDonough was associated with the Thermiodyne Company in 1925 and 1926 and tested and repaired sets. * * *

"McDonough appears to treat the set as a whole and fails to distinguish between such and one pair of radio frequency tubes, XQ. 110. No curve sheets of results to show relative action over the broadcast band were made by McDonough in testing TF6 sets at the Thermiodyne plant. McDonough does not disclose the relative number of turns of the coils of the transformer in the early sets of the TF6 type but it appears that some work was done on this feature by

May 1925, XQ. 168, 169 and 178, and on others later XQ. 199. The situation appears quite indefinite in regard to the respective number of turns in the coils of Exhibit 32, XQ. 208. McDonough made no tests to determine any regeneration effect, XQ. 218. Trube gave McDonough no instructions on that feature, XQ. 226 and 240.

"Dustin testifies that it was Trube's object to make the modified TF6 set more sensitive at lower frequencies and more stable and sensitive over the entire broadcast band and that the New TF6 was even more sensitive on the low frequencies. Dustin is not positive that he ever discussed regenerative effect in the New TF6 with Trube or the action of different portions of the circuit as distinguished from the set as a whole or as to a tight or loose coupling. Dustin who was in charge of the service department of the Thermiodyne Company never saw Trube make any measurements of actions of TF6 sets further than to tune in on broadcasting stations.

"The witness Palmer testifies that Trube· came to the Plattsburg plant at times and that Trube did some testing of sets and made calculations there. We find no definite data concerning the test. of any particular set or sets in Palmer's testimony. It confirms the testimony of others that the New TF6 sets were produced in the spring of 1925. Palmer made the drawings for the New TF6.

"Phelps testifies that he met McDonough at the Amateur Radio Show in New York, March 2nd to 7th, 1925. He fixes the date by the date on a badge worn at the show. Phelps states that McDonough disclosed Trube's new circuit to him and drew a sketch, Trube's Exhibit 28, to illustrate what was disclosed at that time. McDonough referred Phelps to Trube for further information and gave him a card of introduction which is of record, Trube's Exhibit 38. Phelps was highly skilled in radio and he testifies at great length in the record concerning a visit to Trube within the next few days and of further disclosure and discussion of the new set by Trube.

"Phelps testifies that McDonough told him that such system was designed to have a more uniform response over the wave band than previous circuits and to be free of oscillations, particularly at the higher frequencies. Phelps relates at length the disclosure to him by McDonough and later by Trube concerning the theory and action of the loose coupling or relative small primary coil of the transformer. He saw several sets like Trube's Exhibit 32 while visiting Trube at the offices of the Thermiodyne Company, 1819 Broadway, New York City. These sets had the tap point of the autotransformer element about two turns from the filament end of the coil. Phelps testifies that he understood that the coupling discussed was between stages of the radio frequency portion of the set.

"Wheeler has testified at considerable length concerning tests of Exhibit 44 formally made in the presence of opposing counsel. Wheeler measured the inductance of the transformer and capacity of the condensers of the first radio frequency stage of the set. He tested one stage and secured sufficient data to show that the energy transfer might be made substantially constant within the possibility of a slightly curved resultant graf, Exhibit 74. Also Wheeler found the relation of the portions of the coil of the autotransformer, together with the relations of the condensers, to be such that he regarded them as forming a loose coupling.

"Wheeler did not care to say that he knew it to be a fact that Exhibit 44 would give regenerative effect between two stages. The most he could state is that he felt sure it is inherent in the circuits. Wheeler fully sets forth a comparison of his findings with the terms of each of the counts, in turn, so far as they apply. He states he made no measurement to determine the amount of any possible regeneration.

"Concerning the question of the scope of the terms, 'regeneration' and 'feed-back' we reach the conclusion after a careful consideration of the record and citations that, where strictly defined, regeneration involves the idea of strengthening or amplifying the output by causing the output or a portion of it to act on a preceding part of the circuit in an aiding relation, but, that the term is often used in a broader or loose sense to mean mere resultant effect or reactance of the output on the input and where the output might be either increased or decreased depending on the phase relations of the output and input.

"Feed-back is regarded as broad in that the output might be increased or decreased by some magnetic or electric effect

220

carried from a succeeding part of a circuit to a preceding part.

"Stauffer confirms the testimony of other witnesses that the New TF6 was produced in the spring of 1925 and that the autotransformer coil of the first units was tapped as low as 1¾ turns at the filament end. While he was a tester of sets he made no test of interstage radio frequency action. He tested only the performance of the individual sets as a whole.

"It is believed clear that the present record shows that Trube had conception of maintaining the transfer of energy substantially constant or according to predetermined rate over the broadcast band between radio frequency stages thereby eliminating the tendency of the system to get into oscillation at one part of the range or other, particularly at the high frequency end. Exhibits 32 and 44 are held to embody loose coupling and inherently some feed-back.

"We affirm the holding of the Examiner of Interferences in awarding priority to Trube as to counts 1, 2, 6, 7 and 10 on the ground that Trube's Exhibits 32 and 44 produced in the spring of 1925 constitutes a reduction to practice prior to White's filing date."

It is contended, among other things, by counsel for appellant that the testimony of the witness Frederick B. Llewellyn should not have been accepted by the tribunals of the Patent Office, and should not be accepted by this court, because he testified in two other interferences, the numbers of which are unimportant but which relate in a general way to the one here involved, without there stating that appellee had told him "what energy transfer characteristic the coupling would have, even though he was questioned about the circuit, both in his direct and cross-examination"; that, as his oral testimony in the involved interference was not related in the other interferences, and as it was given from 8 to 10 years subsequent to the conversation he had with the appellee, relative to the involved invention, it should not be given serious consideration.

It is further contended by counsel for appellant that the tribunals of the Patent Office placed too much reliance on the testimony of the witness Boyd Phelps; that Phelps' testimony, as to what was said to him by appellee in 1925 relative to appellee's concept of the involved invention, was related by him some 8 years later; and that, instead of stating appellee's concept, the witness stated his own understanding and interpretation of it. Counsel suggest that the witness was prompted in his testimony by counsel for appellee.

After a careful consideration of the clear-cut testimony of the witness Phelps, we are unable to believe that it was, or could have been, colored by any promptings by counsel in the case. Furthermore, we find nothing of record to indicate even remotely that counsel for appellee would stoop to such an artifice.

We are not unmindful of the rule announced in the case of Schwartz v. Graenz, 81 F.(2d) 767, 23 C.C.P.A.(Patents) ——, that, although oral testimony may be sufficient to establish priority of invention, it should, particularly where it is given after a lapse of years, be carefully scrutinized. Nevertheless, we think it fair to say, after a careful consideration of the involved testimony, in the light of the circumstances of the case, that the tribunals of the Patent Office did not err in holding that appellee was entitled to priority of invention of the counts here involved. In so holding, we think it is proper to say that the decisions of those tribunals were not founded solely upon oral testimony.

The issues in the case have been most carefully considered and explained by the tribunals below, and we are content with the observations hereinbefore made.

For the reasons stated, the decision of the Board of Appeals is affirmed.

Affirmed.